**UNITED STATES of America**

**v.**

**Raymond BINET, Defendant.**

**70 Cr. 15.**

United States District Court,
S. D. New York.

Aug. 6, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D., New York City, for the United States of America; Rudolph W. Giuliani, New York City, of counsel.

Robert Kasanof, Legal Aid Society, New York City, for defendant; Robert H. Levy, New York City, of counsel.

## OPINION

COOPER, District Judge.

Our Circuit on January 13, 1971 set aside defendant's adjudication of juvenile delinquency upon the finding that "oral admissions made to an Assistant United States Attorney after his arrest and prior to his arraignment were unconstitutionally obtained [in contravention of 18 U.S.C. § 5035.[1]] and that the introduction of these admissions into evidence against him at trial, over his objection,[2] was reversible error." 442 F.2d at 296.

Subsequent to the Government's petition for a rehearing on the ground that the Court's disposition was bottomed upon an issue "not called to the attention of the trial court by either party," the panel remanded the matter "so as to provide the Government the opportunity it desires, the evidentiary hearing to be limited to the Government's request, that of developing facts bearing upon the issue of delay prior to arraignment." 442 F.2d at 302.

Pursuant to our Circuit's mandate, an evidentiary hearing was held before us on May 6 and 7, 1971.[3]

In their initial opinion reversing Binet's commitment, the Court concluded that the Government had failed to meet its *"heavy burden* to demonstrate that a confession taken from the accused was not the product of a period of detention or custody 'for a longer period than is

necessary to produce the juvenile before a committing magistrate.'" 442 F.2d at 300 (emphasis added). The Court reaffirmed its ruling, first announced in United States v. Glover, 372 F.2d 43 (2d Cir.1967), that the stimulus for enacting § 5035 was to confer upon juveniles minimum procedural safeguards sanctioned by implementation of the protective exclusionary rule. Accordingly, in determining whether the Government has satisfied this "heavy burden," we are governed by our Circuit's expression of the broad Congressional intention underlying this statutory section, and interpretation we endorse fully. As set forth in *Glover*:

Section 5035 evidences a strong Congressional concern with the protection of the rights of juveniles. Unless the juvenile is taken "forthwith" before a committing magistrate, detention shall not "be for a longer period than is necessary to produce the juvenile before a committing magistrate." There is here no hint of any purpose to allow detention for any other objective than prompt arraignment, before a judicial officer, so that the magistrate may explain and protect the juvenile's rights—among others, the right against compulsory self-incrimination and the right to the assistance of counsel. The Act makes plain the concern of the Congress that those of adolescent age be kept separate from hardened adult offenders. We may

---

1. § 5035 provides in pertinent part:
   Arrest, detention and bail
   Whenever a juvenile is arrested for an alleged violation of any law of the United States, the arresting officer shall immediately notify the Attorney General.
   If the juvenile is not forthwith taken before a committing magistrate, he may be detained in such juvenile home or other suitable place of detention as the Attorney General may designate for such purposes, but shall not be detained in a jail or similar place of detention, unless in the opinion of the arresting officer, such detention is necessary to secure the custody of the juvenile, or to insure his safety or that of others.
   In no case shall such detention be for a longer period than is necessary to pro-

   duce the juvenile before a committing magistrate.

2. The basis of defense counsel's objection to the introduction into evidence of this statement was that a recently injected dose of methadone undermined the reliability of Binet's admission. The Court found it unnecessary to review our ruling rejecting this contention, resting its disposition on the delay in arraignment, an issue, as noted above, not raised at trial.

3. Post trial memoranda were filed with this Court by both parties on June 30, 1971. On July 6, 1971, we received a letter from defendant's counsel informing us that they would not submit papers in reply.

assume that it was no less concerned with the greater need of the young and inexperienced for independent, unbiased advice as to the right to counsel and the right to refrain from self-incrimination, when interrogated by the police authorities.

Miranda v. State of Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1965), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." In the case of a juvenile, compliance with the mandate of the Juvenile Act should be the minimum requirement of such safeguards. Treatment of an accused juvenile after arrest as a chattel in the possession of the officers, deliverable at will to the inspectors' officers for interrogation is a plain departure from the command of statute for forthwith production of the juvenile before a magistrate. Statements taken while the statute is being ignored in this fashion must be held inadmissible. (Emphasis as in opinion.) 372 F.2d at 46–47.

■ The unequivocal language of the statute and our Circuit's exposition of its aims lead us to conclude that where, as here, a period of seven and one-half (7½) hours elapses between a juvenile's arrest on a weekday morning and his arraignment before the magistrate, such an extensive time period, in and of itself, is violative of 18 U.S.C. § 5035 unless justified by extraordinary circumstances. Cf. United States v. Beckom, 324 F.Supp. 253 (S.D.N.Y.1971).

While we are satisfied of the honourable intentions of each governmental employee who had a hand in "processing" Binet's case during the 7½ hour interval (there is not a shred of proof to the contrary), this cannot satisfy the statutory proscription which demands more than good faith and best intentions.

■ Although we have already succinctly stated our conclusion, the mandate prompting this report obligates us to elucidate.

*Proceedings prior to attendance at the United States Courthouse*

Since we rest our holding on what we consider the excessive length of the delay and therefore need not analyze in intricate detail the day's events, a general recital of what took place illustrates the non-extraordinary nature of the delay.

Binet was apprehended by postal investigative aid Hudland and taken to the General Post Office at approximately 7:00 A.M. (Tr. 4, 34). From 7:25 until 7:50, Postal Inspector Fuller informed each defendant individually of his rights. (Tr. 8, 29–30, 41–3, 45). Hudland then interviewed Binet from 7:55 until 8:10 eliciting pedigree information (Tr. 8–9); Binet declined to give a statement. (Tr. 9, 48). At 8:10 Binet was not feeling "good"; he placed his head on the table and dozed until 8:30 (Tr. 9). Upon concluding that Binet was an addict, he was given a methadone shot (Tr. 10–11, 53) and then returned to the office where he was being detained. (Tr. 33). Binet's co-conspirators were at that time being interviewed by other postal inspectors. (Tr. 43–8, 51–3). From 8:45 until 9:30 Postal Inspector Lyons, now apparently in charge of the prosecution, caused to be prepared a detailed list of the addresses of each item in the stolen mail sacks; he had the defendants photographed. (Tr. 55–6, 93–5, 99, 108–11).

Fuller at 9:15 telephoned to alert the United States Probation Office that a juvenile had been apprehended. The next half hour, 9:30–10:00, was spent making the appropriate arrangements for readying an automobile to convey all concerned to the United States Attorney's office and to provide coverage at the General Post Office for those who would be absent in connection with the case. (Tr. 60–2). Leaving their stations at 10:00, they started their 45

minute trip to the courthouse at 10:15 (Tr. 63–4) and arrived at 11:00 A.M.

### At the office of the United States Attorney

Binet was placed in the public waiting room of the United States Attorney's office while two postal inspectors spoke with the secretary to the acting chief of the criminal division, Assistant United States Attorney Doyle. (Tr. 66). When Mr. Doyle returned to his office some 45 minutes later, they spoke with him and at 12:00 Noon secured authorization to prosecute. (Tr. 70–2).

Mr. Doyle's secretary spent the next hour "typing up" the necessary forms and making numerous telephone calls to contact an available Assistant United States Attorney. (Tr. 73). At 12:45 P. M., AUSA Sale was assigned the matter (Tr. 130) and the group moved to his office. From 1:05 until 1:10 the inspectors related to Mr. Sale general background information. He immediately telephoned the Probation Department requesting a probation officer be sent to his office. A heavily-burdened probation office was unable to comply promptly. (Tr. 76, 131, 144–5, 187). Not seeing the probation officer, AUSA Sale interviewed defendant Vega from 1:10 until 1:30 (Tr. 132). Still awaiting the arrival of the probation officer, he next interviewed defendant Gomez from 1:30 until 1:50 (Tr. 133). Then it was that probation officer Gannon appeared. Binet's pre-arraignment interview commenced moments thereafter. (Tr. 134–6, 187). Upon its completion at 2:10, Mr. Sale conferred with Mr. Gannon as to a proposed bail reccommendation and then proceeded to the United States Commissioner for arraignment at 2:20.

We note that only one postal inspector was present (at the General Post Office) capable of informing the three apprehended conspirators of their constitutional rights. (Tr. 44–5). As we regard it most proper to consult with each defendant individually, the absence of other qualified inspectors (no doubt caused by an undermanned staff) resulted in the tripling of the time within which this vital undertaking could otherwise have been completed. Likewise, the one hour delay occasioned by Mr. Sale's deferment of the pre-arraignment interview with Binet until the arrival of a probation officer, (Tr. 132–3), is understandable. By so acting, he conformed to the desirable policy of his office of only interviewing a juvenile in the presence of a probation officer who, by reason of training and experience, is usually best capable of guarding the interests of the youth and aiding the prosecutor in offering an informed bail recommendation. (Tr. 145–6).

The testimony adduced at the hearing disclosed for the first time exactly how it came to pass that Mr. Sale put the question that elicited the inculpatory statement, a factor heavily relied upon by our Circuit in reversing the conviction. It did not have the benefit of what has since been developed and accordingly reacted to what first appeared as "sophisticated questioning" by a prosecutor "until after an oral confession was secured." 442 F.2d at 299. Actually, in diligently complying with the established rules of his office, Mr. Sale followed a printed government form for pre-arraignment interrogation. This short form detailed six standard questions to be put to a defendant. The final question (the first five simply served to introduce the assistant and inform the defendant of his full rights) sought information "about [defendant's] background and [his] version of the facts." Government Exhibit 7, 8. Simple fairness makes it imperative that we state that the record does not reveal the slightest indication of an unfair prosecutor—most certainly not one intent upon overcoming the will of a frightened youth.

### Conclusion

Routine delays which consume huge amounts of precious time, understaffed offices with heavy responsibilities to discharge, considerable inexperience here and there—all accompanied by good intent—these do not satisfy a demand-

ing statute concerned at any cost with the prompt arraignment of a juvenile. Simply put, procedures must be instituted to meet the special attention which the statute exacts. It is not uncommon for the law, as in medicine, to provide emergency procedures to rapidly respond to situations requiring immediate action.

For the reasons set forth above, Binet's detention was for a "longer period than [was] necessary to produce the juvenile before a committing magistrate." [4]

---

4. We must reach this result despite our practical recognition that "youth," particularly in the case before us, is not always synonymous with "innocence" or "inexperience;" and despite the overwhelming evidence (aside from the "confession") of defendant's guilt. The Circuit Court's majority decision did not discuss the applicability of the *Chapman-Harrington* harmless error concept. Judge Moore, in dissent, considered the statements, if error, harmless, and viewed "the effect of [the majority decision] is to hold that a crime, no matter how overwhelmingly proved, can be justified if committed by a fifteen-year-old boy who admits to the use of narcotic drugs.