**UNITED STATES of America**

v.

**David A. GOODMAN**

**Crim. No. 85–00105.**

United States District Court,
M.D. Pennsylvania.

Feb. 12, 1986.

Timothy B. Haney, Asst. U.S. Atty., Harrisburg, Pa., for U.S.

Rochelle Friedman, Pittsburgh, Pa., for Goodman.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Defendant David A. Goodman was indicted in two counts for (1) willfully and knowingly conspiring with two police officers of Archbald Borough, Pennsylvania, to import firearms into the United States contrary to the provisions of 18 U.S.C. § 922(*l* )[1] and in violation of 18 U.S.C. § 371, and (2) importing and bringing into the United States twenty-four (24) West German Walther semi-automatic pistols, without the authorization of the Secretary of the Treasury as provided by 18 U.S.C. § 925(d),[2] in violation of 18 U.S.C. §§ 922(*l* ) and 924(a). On December 4, 1985, after trial by jury, defendant was found guilty on Count I, but was acquitted on Count II.

On December 11, 1985, defendant filed a Motion entitled "MOTION TO SET ASIDE

---

1. This section provides, as follows:

   Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

2. Section 925(d) allows for importation in limited circumstances, *e.g.,* for scientific or research purposes, as a curio or museum piece, etc., where specifically authorized by the Secretary of the Treasury. It was conceded that no authorization was sought or received in the present case.

THE VERDICT *OR* FOR JUDEMENT (sic) OF ACQUITTAL *OR* FOR JUDGMENT N.O.V. *OR*, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL *AND* WITH REQUEST FOR LEAVE TO AMEND UPON REVIEW OF THE TRANSCRIPT." Document 100 of the Record (emphasis in original). In this motion, twenty-one (21) numbered errors were assigned in support of defendant's motion. By Order dated December 16, 1985, this court held that to the extent defendant was requesting leave to set forth additional grounds as trial error after reviewing the entire record, the motion was denied. *See* Document 101 of the Record (citing *United States v. Dansker*, 561 F.2d 485, 486 (3d Cir.1977); Fed.R. Crim.P. 45(b); Local Rule 601.4).

By motion filed December 31, 1985, defendant requested an enlargement of time in which to file a brief in support of the December 11, 1985 motion. The reason cited was to await receipt of the transcript which was alleged to be necessary in order to prepare a supporting brief. By Order dated January 2, 1986, this court denied the motion for enlargement of time.[3] *See* Local Rule 601.5 ("Unless for good cause shown the court orders otherwise, post-trial motions may be decided without the transcript of testimony.")

On January 14, 1986, defendant's supporting brief not having been filed,[4] the court *sua sponte*, telephonically contacted defendant's attorney, Rochelle Friedman. In unequivocal fashion, Attorney Friedman told the court that she would not file a supporting brief in the absence of the transcript as ordered by defendant. The court then read Local Rule 601.5, *supra*, to counsel and informed counsel that if she would not file a brief, the court would proceed to dispose of the motion without it. Defendant's counsel, in response, notwithstanding being advised of the local rule and being aware of the court's ruling that the brief would have to be filed within the 30–day period as required by Local Rule 602.1, directly stated to the court that a brief would not be filed until she received the transcript.

Out of an abundance of caution and because the Defendant, David A. Goodman, is a practicing attorney, the court, *sua sponte*, issued an additional order directed to the defendant himself granting him until January 24, 1986 to file a supporting brief in his own behalf if he so desired and the Government was allowed 20 days thereafter to file a responsive brief. Because no supporting brief was filed, it must be concluded that defendant decided to forego this opportunity. The Government's brief was filed February 3, 1986. The motion is now ripe for disposition and, unless the court must bow to the decision of defendant and his counsel not to follow the court's ruling, the merits of the motion will have to be addressed without further input from the defense. For the reasons set forth below, defendant's motion(s) will be denied.

## I. CONSPIRACY

With this background, the court will review the elements necessary to sustain the conspiracy conviction of defendant. Section 371 of Title 18 of the United States Code provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy ..." each is guilty of the offense against the United States. A conspiracy is a combination of two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means. To support a conspiracy conviction, four essential elements must be established: that the conspiracy charged was willfully formed and existing at or about the time alleged in the indictment; that the defendant willfully became a member of the conspiracy; that one of the conspirators committed at least one

---

**3.** Defendant's counsel was telephonically informed of this Order on January 2, 1986.

**4.** Defendant's supporting brief was due on January 10, 1986.

of the overt acts charged in the indictment; and that the overt act was knowingly done in furtherance of some object or purpose of the conspiracy.

Count I of the indictment here alleges that from the summer of 1981 to about July 1, 1982, defendant, an attorney and licensed federal firearms dealer, willfully and knowingly conspired with John E. McHale, Chief of Police of Archbald Borough, and John R. Ryczak, a part-time patrolman,[5] to violate 18 U.S.C. § 922(*l*) by unlawfully and knowingly causing to be imported into the United States from West Germany, Walther semi-automatic pistols (Walthers) without the authorization of the Secretary of the Treasury as required under 18 U.S.C. § 925(d). As will be explained later in this memorandum, defendant could not purchase the Walthers on his own but an order could be legally placed with him by a Police Department which he, in turn, would have to order through the licensed importer. The indictment stated that the conspiracy consisted of an agreement by the co-conspirators that McHale would place official police purchase orders through defendant; that defendant would pay for the firearms; that, upon their receipt by the Archbald Police Department [Department], the firearms would be transferred to defendant and the Police Department would keep several of the weapons free of charge. Seven overt acts were identified, as follows: (1) during the summer of 1981, the initial arrangement was made between defendant and Ryczak, who was also a licensed firearms dealer, whereby the Department would order the Walthers and defendant would pay for them and give the Department several free of charge; (2) the agreement by McHale and Ryczak during the summer of 1981 under which McHale would order the firearms through an Archbald Police Department

Purchase Order so long as defendant paid for them; (3) the mailing on September 16, 1981, of Archbald Borough Purchase Order No. 240 for the Walthers from McHale and Ryczak to defendant in Pittsburgh; (4) on September 18, 1981, defendant made the arrangements for the 24 Walthers to be sold to the Department; (5) the entry by Ryczak on February 1, 1982, in his Federal Firearms Record Book that he had acquired the 24 Walthers from the Department; (6) the transfer on February 10, 1982, of 22 Walthers from Ryczak to defendant; and (7) the payment on March 9, 1982, of $8,996.43 from defendant to Southern Gun Distributors, Inc. for the 24 weapons.

■ As a preliminary matter, the court finds that under Local Rule 401.5, defendant's failure to file a supporting brief results in that motion being deemed withdrawn. Anticipating that this case will be appealed to our Third Circuit Court of Appeals, this court will address the merits of the generalized arguments raised in defendant's December 11, 1985 Motion in the event the Court of Appeals will not agree that the motion can be considered as having been withdrawn.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

Viewing the facts in the light most favorable to the Government, as the court is required to do on a motion for judgment of acquittal,[6] the following facts emerge: Defendant is an attorney who specializes in representing clients engaged in buying and selling firearms. He has also been a federal firearms licensee since 1964 and is licensed to buy and sell, *inter alia*, handguns, shotguns, and rifles under the trade name American Armaments. The Walther

---

**5.** McHale and Ryczak entered guilty pleas to this conspiracy and testified as government witnesses.

**6.** A Motion for Judgment of Acquittal must be granted "if the evidence is insufficient to sustain a conviction of the offense charged in the indictment." Fed.R.Crim.P. 29(a). The standard of review is whether the jury's verdict is supported by substantial evidence viewing the evidence in a light most favorable to the verdict-winner. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Delerme,* 457 F.2d 156, 160 (3d Cir. 1972).

TPH is a semi-automatic 22–caliber pistol that is manufactured in West Germany. It is a sought-after weapon and is considered to be "the Mercedes Benz" of small handguns. The exclusive importer of Walther TPH firearms into the United States is International Armament Corporation, trading as Interarms. A licensee, such as defendant, cannot directly order Walther TPH's from Interarms for his own personal use or for purposes of resale. In fact, under the Federal Firearms Act, 18 U.S.C. § 921, *et seq.*, Interarms can import these weapons into the United States only in certain limited circumstances, *e.g.*, for sale to the United States, or a state or political subdivision thereof, including a Police Department. *See* 18 U.S.C. § 925(a)(1).[7] While defendant knew that he could not order Walther TPH's directly from Interarms, he also knew that the pistols could be purchased through Interarms by submitting a Police Department Purchase Order signed by a Chief of Police.

In September 1981, defendant met John Ryczak, also a licensed firearms dealer who was a part-time policeman in Archbald Borough, Pennsylvania. Defendant inquired about the Archbald Police Department gun inventory and was told by Ryczak that it was a small department consisting of a Chief of Police, three full-time and several part-time police officers, and that the department itself didn't own any guns. Defendant advised Ryczak that if the Archbald Police Department would order some Walther TPH handguns, he would pay for all of them and allow the Borough to keep some while the balance of the guns would be sent to him. Sometime later in September, defendant called Ryczak on the telephone and asked if Ryczak could arrange for the Archbald Police Department to order 24 Walther TPH's. Defendant advised Ryczak that, after delivery of the Walthers

to the Borough, 22 guns should be sent to him and the Borough would be allowed to keep two. Ryczak then approached Police Chief John McHale and told him that he had met a firearms licensee who told Ryczak that he could get two firearms for the Department if McHale would order a larger quantity on behalf of the Borough. McHale said that he doubted that this kind of a transaction was legal but was advised by Ryczak that it was. Ryczak made a phone call to defendant who repeated to McHale that such a transaction was legal. After this conversation, McHale agreed to sign Archbald Purchase Order 240 in blank as requested and gave it to Ryczak. Ryczak called defendant and, pursuant to defendant's request, typed in an order for 24 Walther TPH's on the Purchase Order. Then, in compliance with their arrangement, Ryczak transmitted the Archbald Purchase Order dated September 16, 1981, to defendant who, in turn, submitted the order with an accompanying letter dated September 18, 1981, to Southern Gun Distributors (Southern). In the September 18th letter, defendant advised Southern that the enclosed order was a law enforcement order and verification could be obtained by calling John McHale, Chief of Archbald Police Department. Southern submitted Archbald Purchase Order 240 to the importer, Interarms. Interarms, as required by law, attached Purchase Order 240 to a United States Department of Treasury Form 6, which was filled out by Interarms personnel noting that the order was "for official use only as per attached purchase order." The purchase order and Form 6 were then forwarded to the Bureau of Alcohol, Tobacco and Firearms office (BATF) for the required approval. The application was submitted to BATF on September 30, 1981,[8] importation was approved

---

7. 18 U.S.C. § 925(a)(1) provides:

    (a)(1) The provisions of this [firearms] chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm or ammunition imported for, sold or shipped to, or issued for the use of, the United States or any department or

agency thereof or any State or any department, agency, or political subdivision thereof.

8. A representative of BATF called the Archbald Police Department to verify the purchase and a person called back identifying himself as Chief of Police John McHale and stated that the firearms were for departmental use.

on November 5, 1981 and the application returned to Interarms for further processing. The next step that Interarms had to take in order to obtain release of the 24 Walthers from the bonded warehouse in Alexandria, Virginia, was to pay the appropriate duty to United States Customs. A Customs Stamp indicating duty payment was then placed on Treasury Form 6A and the weapons were withdrawn from the warehouse on January 8, 1982, the date the Customs Stamp was obtained.[9] On January 18, 1982, the 24 Walthers were shipped by United Parcel Service [UPS] from Interarms to Archbald Borough. The UPS driver delivered them to Ryczak personally because no one was present at the Archbald Police Department when delivery was attempted. Ryczak received the Walthers sometime near "the end of January" and, in a subsequent telephone conversation, defendant directed him to enter the 24 firearms in Ryczak's Firearms Book as having been purchased by Ryczak from Archbald Borough on February 1, 1982, and to indicate that 22 were sold to defendant on February 10, 1982.[10] The 22 Walthers were shipped to defendant who paid Southern for the purchase of the 24 Walthers by check number 495 dated March 9, 1982, in the amount of $8,996.43.

▮ Other evidence favorable to the Government bearing on defendant's intent, knowledge and wilfullness were (1) his request that Chief McHale sign an additional Archbald Borough letterhead in blank; (2) his statement in late 1981 or early 1982 to another licensed dealer, Douglas Oefinger, that he was going to get the Walthers through a police department (to which Oefinger replied "you're fucking nuts")

whereupon defendant displayed the blank letterhead with Chief McHale's signature to Oefinger with the comment "I can get anything I want"; (3) his advice to McHale, after McHale continued to question the legality of the transaction, to tell anyone who asked about the purchase of the weapons by the Department that "it was a hedge against inflation"; (4) his failure to discuss the purchase with any other official of Archbald Borough; (5) his knowledge that Archbald had a small full-time police force consisting of the Chief and three policemen; (6) the entry defendant placed in his own Firearms Book as having acquired 22 Walthers from Ryczak and not from the Borough; and (7) his letters of October 27, 1981, to Ryczak and McHale in which he used deceptive language, *viz.*, telling Ryczak he would receive one Walther for himself at the law enforcement price for services expended even though he knew Ryczak would receive the firearm free, as well as mentioning to McHale that weapons were being transferred by the Department for new weapons when such was not the case—defendant knew this because Ryczak had previously told him that Archbald Borough did not own any guns. Furthermore, defendant admitted that he knew he could not order Walthers directly from Interarms for his personal use; that he knew Interarms was the sole importer of Walthers; that he told Ryczak that Walthers had to be purchased on an Archbald Borough Purchase Order signed by the Chief of Police; that he had read the applicable firearms law, including 18 U.S.C. § 925(a)(1), prior to his involvement with McHale and Ryczak; that he testified he could acquire an

9. The 24 firearms were part of a larger shipment of 200 Walthers previously obtained by Interarms from West Germany on December 30, 1981, which arrived in Baltimore and were stored in Interarms bonded warehouse in Alexandria, Virginia. No firearms could be released without the required approval of BTAF and U.S. Customs. There is no evidence in the record that defendant had any knowledge of this shipment and storage when he submitted his order or, for that matter, in what manner Interarms would acquire the firearms he had ordered in September, 1981.

10. The two Walthers that were supposed to become Archbald Borough property were actually taken by McHale and Ryczak for their personal use and they never told any Borough official of the whereabouts of these weapons. Moreover, during the initial stage of this investigation, Ryczak lied to BATF agents when he told them that defendant had paid $1,000.00 to Archbald Borough as part of this transaction.

unlimited number of foreign firearms for resale so long as he could arrange a purchase through a police department, notwithstanding the fact that he, and not the police department, would pay for the weapons; that he instructed Ryczak to record the purchase in his Record Book as an acquisition from the Archbald Police Department (purportedly because he knew Archbald did not have a Firearms Acquisition Book); that the 22 Walthers were never intended to be for the use of Archbald Borough but were for him to possess or sell in the commercial market (commercial sales of some of these Walthers to third persons actually took place); and that he knew Walthers were a sought-after firearm because importation is restricted. A review of the recited facts leads the court to conclude that there was substantial, if not overwhelming, evidence from which a jury could conclude that defendant, along with McHale and Ryczak, willfully agreed to a plan to unlawfully import the Walthers knowing that the firearms were not for the use of the Department and knowing that such an arrangement was illegal. Additionally, each of the overt acts was established by competent evidence. The September 16, 1981, mailing of the Purchase Order to carry out the scheme; the September 18th order from defendant to Southern; the February 1, 1982, entry by Ryczak in his Record Book that he acquired the Walthers from the defendant; the February 10, 1982, transfer of the 22 Walthers from Ryczak to defendant and the March 9, 1982, payment of $8,996.43 from defendant to Southern for the weapons (overt acts 3–7) were not contradicted by defendant. Of course, the Government is only required to prove one overt act. *United States v. Adamo*, 534 F.2d 31 (3d Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976).

Defendant's primary argument at trial was that he did not, and could not, conspire or commit an unlawful act because his actions in arranging for the Archbald Police Department to order these restricted weapons, for which he paid, was permissible under 18 U.S.C. § 925(a)(1). He contends that § 925(a)(1) excludes firearms imported by a political subdivision such as Archbald Borough from the proscriptions of the Firearms Statute. He asserts that the reference in the statute to the words "for the use of" is limited to those firearms which are "issued" and not to firearms "imported." This position is based on his literal reading of 925(a)(1) which states that "(t)he provisions of this [Firearms] chapter shall not apply with respect to the transportation, shipment, receipt, *or* importation of any firearm ... imported for, sold *or* shipped to, *or* issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." (emphasis added). He argues that because the disjunctive "or" is used in the statute that this allows the importation of any firearm so long as it is ordered by a political subdivision, such as Archbald Borough, even if it is not "for the use of" that governmental entity. According to him, the statute requires that the firearm be "for the use of" a governmental entity in order to escape the sanctions provided therein only when it is "issued" to such an entity. Therefore, since the Walthers were "imported" and not "issued", he is free, by his own testimony to purchase "six milliion foreign firearms" so long as he can get a Police Department to submit an order for that amount and BATF approves the Department's order. This is an absurd legal construction and would completely gut the Act which is intended to severely restrict the importation of foreign firearms.[11] Penal laws are not to be con-

11. As further support, the court cites Ruling 80–8 by the Bureau of Alcohol, Tobacco and Firearms [BATF]. *See* Government Exhibit 30. The ruling states: "The purpose of section 925(a)(1) is to permit importation of firearms for exclusive use of government agencies. The statute was not intended and may not be used as

a vehicle by which importable firearms can be introduced into ordinary commercial channels in the United States." Letter from Lonnie J. Muncy, Chief, Imports Branch [BATF] to Importers (May 20, 1980) (informative letter regarding publication of ATF Ruling 80–8). The agency interpretation is consistent with the

strued in such a manner as to defeat the obvious intention of the legislature. *United States v. Lanni*, 466 F.2d 1102, 1109 (3d Cir.1972). Support for the court's reading of § 925(a)(1) can be found in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). In *Bass*, the defendant was convicted of possessing a firearm in violation of 18 U.S.C.App. § 1202(a). That statute provided *inter alia:*

> Any person who—
>
> (1) has been convicted by a court of the United States ... of a felony ... and who receives, possesses, *or* transports in commerce or affecting commerce ... any firearm shall be fined ... or imprisoned....

18 U.S.C.App. § 1202(a) (emphasis added). Specifically at issue was the phrase "and who receives, possesses *or* transports in commerce or affecting commerce ... any firearm." *See Bass, supra* at 339, 92 S.Ct. at 518 (emphasis added). The question before the court was whether the "in commerce or affecting commerce" phrase applied equally to "possesses," "receives" *and* "transports" even though the disjunctive "or" and not "and" preceded the verb "transports." The court held it did in spite of the statute's disjunctive form. "While the statute does not read well under either view, 'the natural construction of the language' suggests that the clause 'in commerce or affecting commerce' qualifies all three antecedents in the list." *Bass, supra* at 339, 92 S.Ct. at 518 (citations omitted). The court noted that the statute would have a "curious reach" were the phrase to only apply to "transports." *Id.* at 340, 92 S.Ct. at 518. Similarly, § 925(a)(1) would have a "curious reach" were this court to hold that "for the use of" applied only to "issued." *See also Lanni, supra* at 1109 ("We agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean.") 18 U.S.C.

court's interpretation of 925(a)(1). Further, Ruling 80–8 was mailed to all licensed firearms

§ 922(*l*) specifically declares it to be unlawful, with certain limited exceptions as heretofore noted, to import firearms into the United States. Such an exception is not presented here. Furthermore, when a question is presented as to statutory interpretation or the meaning of words used in a statute, it is a question of law for the court to determine. *See e.g., Stissi v. Interstate and Ocean Transport Co. of Philadelphia*, 765 F.2d 370, 374 (2d Cir.1985) ("When a decision turns on the meaning of words in a statute or regulation, the decision is one of law which must be made by the court.... The application of a statute's terms to undisputed facts also is a question of law") (citations omitted); *Gaibis v. Werner Continental, Inc.*, 565 F.Supp. 1538 (W.D.Pa.1983) *vacated and remanded on other grounds, sub. nom. Vosch v. Werner Continental, Inc.*, 734 F.2d 149 (3d Cir.1984) *cert. denied*, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 779 (1985) ("It is clear that when a decision turns on the meaning or construction of words in a statute ... then a legal question is presented for the court to decide.") As a result, because it is within the province of the court to decide the law, the jury should not have been permitted any interpretation of the law other than the court's. Great leniency was given to defendant throughout the trial in allowing him to repeatedly assert his interpretation of § 925(a)(1) to demonstrate his intent, state of mind or lack thereof. To avoid confusion for the jury as to what law actually applied, the court informed the jury of the court's interpretation. Indeed, toward the end of trial, the court noted that it had been forced to instruct the jury several times as a result of defense counsel's persistent challenges to the court's interpretation of the law in the presence of the jury and gratuitous comments made by defendant as to the correct interpretation of the law. As a result, the court finds defendant's assigned errors on this issue to be without merit.

dealers.

■ It also appeared to the court that defendant was arguing that if imported firearms were "shipped to" a political subdivision, it was not necessary that the firearms also be "for the use of" that entity. Defendant's reading of the statute again, is primarily focused upon the disjunctive form of the statute. This court rejects defendant's literal reading for the same reasons expressed above. *See United States v. Bass, supra.* We cannot ascribe to Congress the intent to allow firearms dealers to increase their commercial inventory of restricted-import weapons by the simple act of merely placing orders through police departments and having the weapons shipped to that entity which will only act as a conduit in transferring them to the real purchaser. *See also United States v. Mastro,* 570 F.Supp. 1388, 1392 (E.D.Pa.1983) (holding that § 925(a)(1) would not exonerate a defendant where the evidence established "that the guns were not shipped to or issued for the use of a governmental agency...."); *United States v. Brooks,* 611 F.2d 614, 617 (5th Cir.1980) *overruled on other grounds,* 749 F.2d 203 (5th Cir.1984) (this exemption "expressly covers only the 'transportation, shipment, receipt, or importation'" of firearms "for the use of the United States."); *Hyland v. Fukuda,* 580 F.2d 977, 979 (9th Cir.1978) (§ 925(a)(1) exempts firearms owned by the state and used exclusively for its purposes.); *Perri v. Department of Treasury,* 637 F.2d 1332, 1337 (9th Cir.1981) (Congress never intended that the Act could be circumvented where there was a willful violation simply because the Government ultimately received the firearm.).

■ An additional point emphasized by defendant during trial and mentioned in his post trial motion is that there could be no conspiracy to import the Walthers because the Walthers were not actually imported as a result of the Archbald Purchase Order but were received in the United States by Interarms as part of a larger shipment on December 30, 1981, which was prior to the final approval and withdrawal of the 24 Walthers from the Bonded Warehouse on January 8, 1982. Assuming, without conceding, that such an argument may have relevance as to Count 2 which charged defendant with the importation of the Walthers "on or about February, 1982", it has no relevance to the conspiracy count on which defendant was convicted.

The crime of conspiracy is completed with the performance of an illegal overt act in furtherance of the agreement's illegal objective. *See e.g., United States v. Abushi,* 682 F.2d 1289 (9th Cir.1982); *United States v. Littlefield,* 594 F.2d 682 (8th Cir. 1979). It is not necessary that the illegal purpose be successful or the objective completed or even that the objective be possible. *United States v. Janotti,* 673 F.2d 578 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). In the case *sub judice,* overt acts one through four occurred prior to the arrival of the larger shipment on December 30, 1981. As a matter of fact, BATF had approved the importation of the 24 Walthers on November 5, 1981. It would appear that the duty was not paid by Interarms and the weapons withdrawn from the warehouse until January 8, 1982, because the larger shipment, including the 24 at issue here, did not arrive in this country until December 30, 1981. The actual location of the weapons might have had some bearing on the substantive Count 2 but would be irrelevant to the conspiracy charge because the actual importation is not necessary to establish the conspiracy, all that is needed is an unlawful agreement to import and the taking of an overt act to implement the agreement. Furthermore, there is no evidence that defendant was ever aware of the arrival date of the Walthers into the United States or when Interarms ordered them from West Germany.

■ Even assuming *arguendo* that the situs or time of importation was relevant to the conspiracy charge, the court reaffirms its holding that importation was not complete until the firearms were released with BATF approval and payment of custom duties made. *See e.g., Century Arms, Inc. v. Kennedy,* 323 F.Supp. 1002 (D.Vt.1971), *aff'd* 449 F.2d 1306 (2d Cir.1971), *cert. de-*

*nied,* 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972). *Century Arms,* written by then-district Judge Oakes, supports this court's definition of when the importation in this case was complete.

> The genesis of this suit is the Secretary of the Treasury's refusal, after October 22, 1968, to allow Century to "import" the firearms covered by the license issued by the Office of Munitions Control. "Importation" is used here in a narrow sense, as the guns are physically in the United States, but are being held in bonded warehouses.... When we speak of the Secretary's refusal to allow Century to "import" the guns, then, we mean refusal to allow Century to remove the guns from the warehouses and resell them to its customers.

Moreover, Judge Oakes' definition of importation, while in the context of a surplus military firearms case, was directed to 18 U.S.C. § 922(*l*). Again, importation as such, if it had any relevancy, it would apply only to Count II, the substantive charge for which defendant was acquitted. The conspiracy, however, as noted *supra,* was complete with the commission of overt acts, some of which occurred, in any event, before December 30, 1981, the date of physical arrival of the guns.

In conclusion, there was overwhelming evidence to support defendant's conspiracy conviction. Furthermore, the court reaffirms its holdings as to correct interpretation of § 925(a)(1) and as to the definition of importation. As a result, defendant's Motion for Judgment of Acquittal will be denied.

### III. MOTION FOR A NEW TRIAL

■ Defendant states "[t]he interest of justice so requires a new trial," and "[t]he verdict is against the law and/or against the weight of the evidence." *See* Document 100 of the Record at 2 ¶ 7 & 8. A motion for a new trial, unlike a motion for judgment of acquittal, is based upon the weight of the evidence. *See* Fed.R.Crim.P. 33. In the court's view, the verdict clearly

was not against the weight of the evidence and the motion will be denied.

Also related to the Motion for a New Trial is defendant's challenge that Judge Nealon served as trial judge and also served as judge for at least two of the four grand juries which heard evidence on this matter. Presumably, defendant is arguing that this creates some prejudicial effect. The proposition is so meritless that it is not deserving of any discussion.

As a catchall, defendant asserts "numerous" errors during the pretrial state and during the trial. The failure to specify and particularize those errors is in direct contravention of Local Rule 601.4. The court, however, does not believe any errors were committed and reaffirms its holding on the issues of selective prosecution, transfer of venue, interpretation and construction of 18 U.S.C. § 925(a)(1) and its constitutionality as construed by the court in response to defense motions. *See* Memorandums and Opinions dated July 26, 1985, Document 31 of the Record (denying Motion to Transfer); September 4, 1985, Document 53 of the Record (denying Motion for Reconsideration of Motion to Transfer); September 17, 1985, Document 56 of the Record (denying Motion to Dismiss, or in the Alternative, to Quash the Indictment); October 29, 1985, Document 65 of the Record (granting evidentiary hearing in light of Motion for Reconsideration of the Motion to Dismiss on Grounds of Selective Prosecution); November 19, 1985, Document 79 of the Record (denying, after evidentiary hearing, Motion for Reconsideration of the Motion to Dismiss on Grounds of Selective Prosecution); November 19, 1985, Document 80 of the Record (denying Motion for Reconsideration of Motion to Dismiss and/or Quash the Indictment).

■ Continuing with the litany of assigned errors is defendant's contention that the "jury was impermissibly influenced by the repetitive statements of the court" as to the correct interpretation of § 925(a)(1). The court is confident that the record will disclose that this was necessitated by the conduct of counsel and defendant in their

continued disagreement in front of the jury regarding the court's interpretation of § 925(a)(1). To avoid any incorrect conclusion by the jury that they (the jury) had the opportunity to choose between the court's interpretation and the defense's interpretation, the court was forced to explain to the jury that it was the court's view of the law that was to prevail. The court, however, went to great lengths also to explain that the jury should consider defendant's legal interpretation of the statute as bearing upon his intent, willfullness or state of mind. The court finds no error. *See also* text *supra* at 809–10.

Finally, defendant contends that the court erred in refusing to give "numerous" proposed instructions. A review of those instructions illustrates that they were properly refused and the court finds no error. While there remain other errors listed by defendant, the court finds them to be so devoid of merit as not to warrant discussion.[12] Defendant's Motion for a New Trial will be denied.

---

12. *See e.g.,* ¶ 4d: "The government charges that Defendant failed to obtain the authorization of the Secretary of the Treasury under 18 U.S.C. 925(d), (sic) yet the government indicated in its trial brief that § 925(d) was not at issue, which statement was reiterated during trial by A.U. S.A., Timothy B. Haney at side-bar." Document 100 of the Record at 2.