**UNITED STATES of America, Appellee,**

v.

**Louis LANNI, Sr. Appellant in No. 72-1028, and Mary Maiale.**

**Appeal of Mary MAIALE, in No. 72-1029.**

**No. 72-1028/9.**

United States Court of Appeals, Third Circuit.

Argued June 20, 1972.

Decided Aug. 14, 1972.

Lester J. Schaffer, Zink, Shinehouse & Holmes, Philadelphia, Pa., for appellants.

Jill Wine Volner, Dept. of Justice, Washington, D. C., Carl Melone, Acting U. S. Atty., E. D. Pa., Philadelphia, Pa., Michael C. Sloane, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before GIBBONS, JAMES ROSEN and HUNTER III, Circuit Judges.

## OPINION OF THE COURT

JAMES ROSEN, Circuit Judge.

Growing concern with corruption between management and labor representatives prompted Congress to enact Section 302 of the Taft-Hartley Act, 29 U. S.C. § 141 (1947). Initially, as passed by the House of Representatives, the bill "made it an unfair labor practice [for employers] to give favors to 'any person in a position of trust in a labor organization * * *'" H.R. 3020, 80th Cong., 1st Sess., § 8(a) (2). The scope of this bill was enlarged when it reached the Senate to include, in the words of Senator Taft, a 'case where the union representative is shaking down the em-

ployer * * *' 93 Cong.Rec. 4746." The resulting bill "outlaw [ed] all payments, with stated exceptions, between employer and representative," imposing criminal liability on both the employee representatives and those members of management who indulged in the forbidden transactions. United States v. Ryan, 350 U.S. 299, 305–306, 76 S.Ct. 400, 100 L.Ed. 335 (1956).[1]

The Taft-Hartley Bill did not succeed in stamping out the corruption problem, however. Many of those dishonest enough to betray the employees' interests prior to the legislation were devious enough to avoid the reach of the Taft-Hartley Act. "[W]idespread public concern" with "racketeering, crime, and corruption"[2] continued; and the Eighty-Sixth Congress responded by enacting the Labor Management Act of 1959. By so doing, Congress hoped to "close loopholes" which "both employer representatives and union officials [had] turned to advantage at the expense of employees."[3] The bill was intended to make certain that employer representatives, like other trustees, would not profit from their positions of trust:

> For centuries the law has forbidden any person in a position of trust to hold interests or enter into transactions in which self-interest may conflict with complete loyalty to those whom they serve. Such a person may not deal with himself, or acquire adverse interests, or make any personal profit as a result of his position. The same principle has long been applied to trustees, to agents, and to bank directors. It is equally applicable to union officers and employees. The ethical practices code of the American

Federation of Labor and Congress of Industrial Organizations states—

> It is too plain for extended discussion that a basic ethical principle in the conduct of union affairs is that no responsible trade union official should have a personal financial interest which conflicts with the full performance of his fiduciary duties as a workers' representative.

After the McClellan committee hearings no one can dispute the simple fact that although the vast majority of union officials are honest and conscientious men, a small number have ignored this basic standard of conduct. No one would deny that the conduct is wrong. The wrongs should not be ignored by the Federal Government. The national labor policy is founded upon collective bargaining through strong and vigorous unions. *Playing both sides of the street, using union office for personal financial advantage, undercover deals, and other conflicts of interest, corrupt and thereby undermine and weaken the labor movement.* The Congress should check the abuses in order to foster the national labor policy. *The Government which vests in labor unions the power to act as exclusive bargaining representative must make sure that the power is used for the benefit of workers and not for personal profit.*[4] (emphasis supplied.)

The part of that Act which is of particular concern to us in this case is Section 302(a) (1) and (4) and (b), 29 U.S.C. 186(a) (1) and (4) and 186(b). Subsection (a) proscribes payments by employers "to any representative of any

---

1. The 1947 version of Section 302 provided, in relevant part, as follows:
 Sec. 302. (a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.
 (b) It shall be unlawful for any representative of any employees who

are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

2. United States Code Congressional and Administrative News, 86th Cong. 1st Sess. 1959 Vol. II, pp. 2328–2329.

3. Id. p. 2330.

4. Id. pp. 2330–2331.

of his employees \* \* \*" or to "any officer \* \* \* of a labor organization \* \* \* with intent to influence him in respect to any of his actions, decisions, or duties as a representative." Subsection (b) imposes a parallel prohibition on those who might receive such funds, and makes it "unlawful for any person to \* \* \* receive, or accept \* \* \* any payment, loan, or delivery of any money or other thing of value prohibited by section (a)."[5] Since (b) incorporates (a)'s prohibitions, it forbids any employee representative to accept money from any employer or to accept any payment made with the intent to influence his behavior as a representative.

The 1959 amendments:

remove any doubt that all forms of bribery which might escape the provisions of [the then] existing law would be prohibited under pain of criminal penalties. \* \* \* The intent of these amendments to sections 302(a) and (b) is to forbid any payment or bribe by an employer of anyone who acts in the interest of an employer whether technically an agent or not and to forbid the receipt of any

such bribe by any person, whether an individual, an officer or employee of a labor organization or a committee representing employees. Payment to and receipt of such payments by any union officer or employee having the intent of influencing such officer or employee in respect to any of his actions, decisions, or duties as a representative of employees or as such union officer or employee would also be made a criminal offense.[6]

With these basic principles in mind, we can proceed to the case at hand. The appellant Louis Lanni, Sr., was convicted under amended § 302(b), 29 U.S.C. § 186(b), for receiving and accepting $16,300, from D'Agata National Trucking Company (D'Agata Trucking) while he was Secretary-Treasurer of Teamsters' Local No. 830 and while that local represented D'Agata Trucking's employees. Both Lanni and appellant Mary Maiale were convicted of a separate count of conspiring to obtain and receive the money.[7] 18 U.S.C. § 371. Lanni was sentenced to eight months imprisonment and put on probation for the year following his release. He was also

---

5. 29 U.S.C. § 186(a) and (b) [§ 302(a) and (b) of the Taft-Hartley Act] provides, as follows:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee

directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b) (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

6. U.S.Code Cong. & Admin.News, op. cit. p. 2360.

7. The indictment charged Mary Maiale with receiving the $16,300. "on behalf of Louis Lanni." (p. 3 of the indictment.)

fined $5000. Maiale was fined $2500. and sentenced to one year probation.

On this appeal three issues are presented for review: (1) did the court below err in construing 29 U.S.C. § 186 (b); (2) is that statute unconstitutionally vague, and (3) did the court err in refusing defendants' requested instructions on willfulness.

The facts leading to the appellants' convictions are admirably set forth in the thorough opinion of Judge Becker.[8] The appellants, who did not testify, do not challenge his findings and we see no reason to reiterate them in detail. Instead, we limit ourselves to recounting only the most critical facts and to setting forth the legitimate inferences which the jury could reasonably have drawn from them. United States v. Hamilton, 457 F.2d 95, 99 (3d Cir. 1972), United States v. Moraites, 456 F. 2d 435 (3d Cir. 1972).

The evidence established that Mary Maiale received $16,300. from D'Agata Trucking, ostensibly for her work as a bookkeeper.[9] Maiale was, however, a full time bookkeeper for the Health and Welfare Fund of Lanni's Local 830 and "never performed any bookkeeping * * * or any other services" for D'Agata Trucking.[10] At the time she was receiving these payments, Lanni had full knowledge that she was not performing any services in exchange for her "salary." This is not surprising as Maiale was Lanni's "girlfriend,"[11] and shared a Miami Beach condominium apartment with him. The down payment check on that apartment was drawn on the account where Maiale deposited her "salary" checks. Nonetheless, Lanni openly referred to the apartment as "my place."[12]

The appellants "had other business dealings and * * * in them Maiale was a 'straw man' for Lanni."[13] When Lanni and two partners established a truck leasing company, Lanni chose to place his interest in Maiale's name. Similarly, when Lanni contemplated entering the realty field, his plan called for Maiale's holding his interest, but in name only. Together, these transactions gave the jury reasonable ground to believe that "what was nominally Maiale's was, in reality, Lanni's".[14]

Soon after Maiale was placed on the D'Agata Trucking payroll, she and Lanni began making very frequent visits to Joe D'Agata, an officer of the Trucking Company. Lanni took a strong interest in D'Agata Trucking and began to refer to it as being partly his. The Lanni-D'Agata ties were publicized enough for Joe D'Agata to become known as "Lou Lanni's boy."[15]

Lanni repaid D'Agata's salary to Maiale by forcing local businesses to hire D'Agata Trucking. C. Schmidt & Sons breweries, for example, were told to switch to D'Agata and they complied because they recalled how on a prior occasion, when they had refused to accede to Lanni's wishes, Lanni had exercised his power over their Teamster employees to shut down their plant. D'Agata Trucking underwent a sudden growth, which continued until Lanni chose to destroy D'Agata's business by forcing Schmidt and other companies to replace D'Agata Trucking.[16]

---

8. The decision, which denied the defendants' motion for judgment of acquittal or, in the alternative for a new trial is reported at 335 F.Supp. 1060 (E.D.Pa. 1971).

9. There was testimony that Maiale was supposed to invest approximately $33,000. in return for a 25% stock interest in D'Agata Trucking, but Maiale never invested any money. Nonetheless, she continued to draw her "salary."

10. 335 F.Supp. 1060, p. 1063.

11. Id. p. 1062.

12. Id. p. 1065.

13. Id.

14. Id.

15. Id. p. 1063.

16. Lanni called Schmidt's Director of Transportation, Charles McDevitt, in January or February of 1967, and demanded that Schmidt's fire the firm doing its Wilmington overflow deliveries, even though Schmidt's was well satisfied with

## I

In his charge, Judge Becker told the jury that section 302 did not require that the government show Lanni had actually received the money D'Agata had paid Maiale. In his view, Maiale's receiving money from D'Agata as the "agent, intermediary, go-between or front" for Lanni would come within the ambit of 302(b) if all three parties contemplated that (1) Maiale would receive the money and "like a conduit" transmit it to Lanni; or that (2) she would receive the money on his "behalf" and hold it "for his use." [17]

The appellants now argue, as they did in the district court, that this instruction was erroneous. They claim that § 302 does not reach a situation where the labor representative merely benefits from a payment made by management. According to them, the government's burden under 302(b) was to demonstrate that Lanni had actually received the money, i. e. that he had the money "in his hands." [18]

The appellants concede, as they must, that had Lanni received the $16,300. directly from D'Agata Trucking, he would have been in violation of § 302(b) and would have been subject to criminal penalties for his corrupt conduct. Seen in proper perspective, Lanni and Maiale are really arguing that it was lawful for Lanni to circumvent the blanket prohibition of 302(b) by using his "girlfriend" as his "agent, intermediary, go-between or front." They contend, in effect, that Maiale's initial receipt of the D'Agata money shielded it from the taint which would have attached had Lanni received it directly, and that the money remained untainted (1) even though Lanni knew Maiale was receiving it without performing any services for D'Agata and (2) in the face of evidence establishing that Lanni did D'Agata favors such as procuring the Schmidt contract, in ex-

---

that hauler, and replace that firm with D'Agata National. Lanni also helped D'Agata in connection with Penn Beverages and with getting Schmidt's glass hauling for D'Agata.

17. That charge was, as follows:

However, the crucial question * * * is what is meant by receiving or accepting the money.

Now, I instruct you that if based upon the direct and circumstantial evidence in this case you find beyond a reasonable doubt that Mr. Lanni actually received or accepted in his possession the sums paid by D'Agata to Miss Maiale, then that aspect of the Labor-Management Relations Act which requires acceptance or receipt has been met. And you may, if all other requisites of proof under the Act as I will define them to you have been met, you can make a finding of guilt. If you find based on all the evidence and beyond a reasonable doubt that Mr. Lanni actually received or accepted in his possession the sums paid by D'Agata to Maiale, then that aspect of the Act is met.

However, I also instruct you that the requirements of Section 186 of the Labor-Management Relations Act concerning acceptance and receipt by an employee representative or officer of a labor organization are also met, if, based upon the evidence in the case, you find beyond a reasonable doubt that money paid by an employer is received or accepted by someone who is the agent, intermediary, go-between or front for the employee representative or officer of a labor organization.

Now, in order, however, for one to be an agent, intermediary, go-between or front, it is essential [1] that the parties to the transaction contemplate that the agent, intermediary, go-between or front is to receive the payments on behalf of the employee representative or labor union officer; with the further contemplation that the monies be available to or transmitted like a conduit to the employee representative or labor union officer; or that [2] the parties contemplate that the money be received and held for his use.

18. This argument was put forth by the appellants at the trial level, as well. 355 F. Supp. 1060, 1067. In the district court, the government argued that no receipt by Lanni or benefit to him was necessary for a § 302 conviction. If Lanni had directed or suggested that D'Agata pay Maiale, that would be sufficient, in the government's view. For an exposition of the contrasting positions, see pp. 1071–1073.

change for the payments to his "girlfriend" Maiale. In the appellants' view, once the money was filtered through Maiale, Lanni was thereafter free to benefit from the money she was holding for him.

The appellants contend that drawing a distinction under § 302(b) between direct and indirect payments produces a viable interpretation of that provision even though the companion section 302(a) concededly makes no such distinction. Under their analysis an employer would be prohibited from using a middleman to transmit a bribe, but an employee representative would not be barred from so acting.

In support of this interpretation, the appellants rely upon the differences between the wording of subsections (a) and (b). Subsection (a) prohibits payment to an employee representative "by an employer * * * or any person who acts * * * in the interest of the employer." Subsection (b) prohibits "any person" from receiving "any [subsection (a)] payment" but does so without specifically prohibiting the receipt of payment by someone "who acts * * * in the interest of" the employee representative. The appellants argue that the omission from subsection (b) of the phrase used in subsection (a) indicates that Congress did not intend to prescribe payments made to representatives through an "agent, intermediary, go-between or front."

Appellants' thesis is devoid of merit. Their end-run tactics might be suitable on a football field, but they are not persuasive in a court of law. Our purpose is to interpret a statute so that it fulfills the legislature's purpose and not to construe it, as the appellants would have us do, to subvert the legislative intent. As the Supreme Court said in United States v. Shirey, 359 U.S. 255, 260–261, 79 S.Ct. 746, 749, 3 L.Ed.2d 789 (1959), where the appellants were also attempting to finesse a bribery statute:

> Statutes, including penal enactments, are not inert exercises in liter-

ary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." United States v. Whitridge, 197 U.S. 135, 143 [25 S.Ct. 406, 408, 49 L.Ed. 696]. This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. See United States v. Wurzbach, 280 U.S. 396, 399 [50 S.Ct. 167, 168, 74 L.Ed. 508.] Statutory meaning, it is to be remembered, is more to be felt than demonstrated, see United States v. Johnson, 221 U.S. 488, 496 [31 S.Ct. 627, 55 L. Ed. 823], or, as Judge Learned Hand has put it, the art of interpretation is "the art of proliferating a purpose." Brooklyn Nat. Corp. v. Comm'r, 2 Cir., 157 F.2d 450, 451.

 In the case before us the statutory purpose is clear: The stamping out of "all forms of bribery" between management and labor officials.[19] Furthermore, the broad and unequivocal language of § 302 clearly reaches the conduct for which appellants were convicted. Read together subsections (a) and (b) express an intention to forbid indirect union official-management bribery, be it through the middleman of the officials or of management.

The original subsection (a) of the Taft Hartley Act forbid employers from giving any money to a representative of his employees, whereas (b) prohibited the representative from receiving any such payments. Both provisions were revised and expanded in 1959, so that (a) now also reaches payments made to an employee representative by an agent of the employer. Subsection (b), as it now reads, makes it "unlawful for any person to receive or accept * * * any payment * * * prohibited by subsection (a)." Appellant argues that "any payment" really means only "direct payment," but we reject this interpretation. "[A]ny payment" is clearly

19. See supra p. 5.

sweeping in its scope and embraces both direct and indirect payments.

This construction of § 302 is required by the basic principles set forth in Arroyo v. United States, 359 U.S. 419, 424, 79 S.Ct. 864, 867, 3 L.Ed.2d 915 (1959):

> '[T]hough penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature.' United States v. Wiltberger, supra [5 Wheat. [76]] at [page] 95 [5 L.Ed. 37]. As Mr. Justice Holmes put it, 'We agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean.' Roschen v. Ward, 279 U.S. 337, 339 [49 S.Ct. 336, 73 L. Ed. 722].

The other Circuits which have interpreted section 302 support our conclusion that it embraces indirect payments. In Brennan v. United States, 240 F.2d 253 (1957) cert. den. 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957), the Eighth Circuit upheld the convictions of union officials who had not received any direct payments from the employer. Instead, a check had been sent to a third party, the son of one of the officials, and it had been made out to a nonexistent corporation as the payee. The third party deposited the check to his father and two other officials, retaining some of the money for himself. Korholz v. United States, 269 F.2d 897 (10th Cir. 1959), cert. den. 361 U.S. 929, 80 S.Ct. 367, 4 L.Ed.2d 352 (1960) is to the same effect. The employer in that case discharged the loan owed by an employee representative by making bank payments on his behalf. The court upheld the conviction which arose out of this indirect payment, noting that the use of the third party did not permit the defendants to circumvent the statute.[20] The

most recent case on indirect payments is United States v. McMaster, 343 F.2d 176 (6th Cir. 1965). The union official was president and controlling stockholder of a trucking company which received funds from the employer of employees he represented. The employer in that case had made payments not directly to his employees' representative, but rather had sent these checks to a corporation controlled by the representative. Holding that by virtue of the representative's "substantial access" to the corporate funds, receipt by the corporation constituted a violation of § 302, the court affirmed the representative's conviction. We find no reason to depart from the rationale of Brennan, Korholz and McMaster.

## II

As a connected second argument, the appellants claim that section 302 as construed by the district court was unconstitutionally vague. We disagree. The test for vagueness, which has recently been reiterated in Palmer v. City of Euclid, 402 U.S. 544, 545, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971), was set forth in United States v. Harriss, 347 U.S. 612, 617–618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954):

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

Applying the Harriss test to the facts of this case, we find no constitutional vagueness. The statute's broad prohibition of "all payments" gave the appellants fair notice that indirect payments were included.

---

20. The decisions in Brennan and Korholz are based on the original version of § 186. Because the original § 186 is narrower than the amended version, anything held to have been included within the coverage of the pre-amendment version would a fortiori be included in the amended § 302.

### III

When he came to the question of "willfulness," the trial judge charged the jury that:

> Now, an act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law. Intent to disregard the law, that's willfulness.
>
> I'll repeat it: An act is done willfully if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.[21]

The appellants contend that these instructions were inadequate and claim that it was reversible error for the judge to refuse to give their requested instructions:

18. Before you may return a verdict of guilty against either defendant, you must find that he or she acted willfully. This means that either intentionally and deliberately violated the law. In reaching your conclusion, you may consider the wording of the statute under which defendants are charged and, if it does not clearly make unlawful the conduct of these defendants, or either of them you should find that neither defendant acted willfully.

29. The word 'willfully,' as used in the statute, requires proof not only that the defendants actually did violate the provisions of the law but, further, that they were conscious of the fact that what they were doing constituted a violation of the law.

---

21. Appellants' appendix p. 37a. Note that willfulness must be shown in order to

 Requested instruction No. 18 invited the jury to make its own interpretation of Section 302. However, it is fundamental that the construction of a statute is within the province of a judge. The requested charge, which would have cast the jury in the role of the judge, was properly refused.

 Similarly, requested instruction No. 29 does not conform with the law. Section 302 is, in the language of the Supreme Court, *"malum prohibitum."* United States v. Ryan, supra, 350 U.S. p. 305, 76 S.Ct. 400. Consequently, all that had to be shown in order to establish that it was "willfully" violated is that Lanni benefited from the money paid to Maiale with knowledge (1) that they were "payments" and (2) that D'Agata employed workers represented by Lanni. United States v. Ricciardi, 357 F.2d 91, 100 (2nd Cir. 1966), cert. den. 384 U.S. 942, 86 S.Ct. 1464, 16 L. Ed.2d 540 (1966); United States v. Alaimo, 191 F.Supp. 625, 627 (M.D.Pa. 1961), aff'd 297 F.2d 604 (3d Cir. 1961) cert. den. 396 U.S. 817, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962). See United States v. Budzanoski, 462 F.2d 443 (3d Cir. 1972); Cf. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

 In his charge, Judge Becker told the jury that an act is done willfully when it is done "with bad purpose * * * to disregard the law." We agree with the judge that this instruction was "more favorable to defendants than that to which they were entitled." United States v. Lanni, 335 F.Supp. p. 1079. "Bad purpose" need not be shown. The appellants have no basis for complaint.

The convictions will be affirmed.

obtain a conviction under § 302(b) by virtue of § 302(d).