100 Cal.Rptr.2d 251 (2000)
83 Cal.App.4th 1146
UNITED FARM WORKERS OF AMERICA, AFL-CIO, et al., Plaintiffs and Respondents,
v.
DUTRA FARMS et al., Defendants and Appellants.
No. H019659.
Court of Appeal, Sixth District.
September 27, 2000.
As Modified on Denial of Rehearing October 25, 2000.
Review Denied December 20, 2000.[*]
*253 Terrence R. O'Connor, Salinas, for Defendant and Appellant Dutra Farms.
Littler, Mendelson, Fastiff, Tichy and Mathiason and Randolph C. Roeder, Philip L. Ross, San Francsco, and Tracy L. Parola; and Terrence R. O'Connor, Salinas, for Defendant and Appellant Clint Miller Farms, Inc.
Robert P. Roy for Ventura County Agricultural Association as Amicus Curiae in support of Defendants and Appellants.
Altshuler, Berzon, Nussbaum, Berzon & Rubin and Stephen P. Berzon and Scott A. Kronland, San Francisco, Marcos Camacho, *254 Keene, and Annabelle G. Cortez, for Plaintiffs and Respondents.
*252 ELIA, J.
The United Farmworkers of America, AFL-CIO and associated individuals ("UFW") sued appellants Dutra Farms and Clint Miller Farms, Inc. for unfair business practices and for violating Labor Code section 1155.4, subdivision (c) (hereafter section 1155.4(c)).[1] The UFW moved for summary judgment. The trial court granted the motion, entered judgment for the UFW, and declared that appellants violated section 1155.4(c). The court also enjoined appellant Clint Miller Farms from violating the statute in the future.
On appeal, the main issue is the applicability of section 1155.4(c). In essence, section 1155.4(c) prohibits agricultural employers from giving anything of value to employee groups for the purpose of causing such employee groups to influence other employees regarding their collective bargaining rights. Like the trial court, we conclude that section 1155.4 applies to these circumstances. We will therefore affirm.

FACTS AND PROCEDURAL BACKGROUND
The undisputed facts are as follows.
In 1996, the UFW announced an ongoing campaign to organize strawberry pickers into a union. Subsequently, the "Pro Workers Committee" (PWC) was formed to oppose the UFW. Several Miller employees and several Dutra employees participated in the initial PWC meetings. In January 1997, PWC changed its name to Ag Workers of America (AWA). AWA incorporated as a non-profit corporation. Its president, vice president, secretary and treasurer were all either Miller or Dutra employees. In June of 1997, AWA was, in essence, replaced by the Agricultural Workers Committee (the AWC), a nonprofit corporation with the same officers, address, telephone numbers, and logo as the AWA.
Hereafter, we refer to PWC, AWC, and AWA as "the Committee."[2]
The Committee "held weekly evening meetings during the growing season in a rented hall in Watsonville, held smaller board meetings, and organized public activities such as marches and demonstrations." One such march, held in August 1996, included thousands of farm workers from at least 14 employers other than Miller or Dutra. Employees of "dozens" of different agricultural employers "belonged to" the Committee "and/or" actively participated in its activities.
Dutra paid $1,163 for rental of portable toilets used in the August 1996 march. On two occasions in early 1997, Miller donated $250 to the Committee, for a total contribution of $500.
The UFW then sued Dutra, Miller, and others for violating section 1155.4(c). The UFW also alleged that appellants' violation of section 1155.4 constituted an unfair business practice. (Bus. & Prof.Code, § 17200.) The UFW moved for summary judgment.[3] The trial court granted the motion.
In its summary judgment order, the trial court stated:
"[T]he Court finds that there is no triable issue of material fact as to whether defendants Clint Miller Farms and Dutra Farms violated California Labor Code § 1155.4, in that the evidence is uncontroverted that Clint Miller Farms and Dutra *255 Farms are agricultural employers; that Clint Miller Farms paid or delivered money or other things of value by delivering two checks to the Ag Workers of America; that Dutra Farms paid or delivered money or other things of value by paying the bill for rental of latrines for the August 10, 1996 Pro Workers Committee march; and that such payments or deliveries of money or other things of value were to committees of employees of defendant agricultural employers for the purposes of influencing employees in the exercise of their rights to organize and bargain collectively through representatives."[4]
The trial court then entered a separate final judgment against appellants. (Code Civ. Proa, § 579.) In the judgment, the trial court declared that appellants had violated section 1155.4(c) and also enjoined appellant Clint Miller Farms from violating the statute in the future. The trial court declined to enter an injunction against Dutra Farms. Because Dutra had committed only one undisputed violation, the trial court decided that the declaratory judgment would be sufficient to prevent future violations of the law.
This appeal ensued.

STANDARD OF REVIEW
Summary judgment is granted when there are no triable issues as to any material facts and the moving party is entitled to judgment as a matter of law. (Code Civ. Proa, § 437c, subd.(c).) When reviewing a trial court's decision to grant summary judgment, we must identify the issues framed by the pleadings, and determine whether the moving party has established facts which negate the opposing party's facts and justify a judgment in the moving party's favor. When the moving party's facts prima facie justify a judgment, we determine whether the opposing party has demonstrated the existence of a triable issue of material fact. (Turner v. Anheuser-Busch, Inc. (1994) 7 Cal.4th 1238, 1252-1253, 32 Cal.Rptr.2d 223, 876 P.2d 1022.)

DISCUSSION

I. Section 11554(c)

The UFW argues that section 1155.4 applies to these circumstances. Appellants disagree.[5] As we will explain, we conclude that the statute applies and that the trial court properly entered summary judgment for the UFW.

A. Language of Section 11554(c)

We begin with the statutory language. Section 1155.4 provides, in relevant part, "It shall be unlawful for any agricultural employer or association of agricultural employers, or any person who acts as a labor relations expert, adviser, or consultant to an agricultural employer, or who acts in the interest of an agricultural employer, to pay, lend, or deliver, any money or other thing of value to any of the following: [¶] ... [¶] (c) Any employee or group or committee of employees of such employer in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing."

B. Contentions of Parties

According to appellants, section 1155.4(c) does not apply when one or more employers, who do not constitute an association of employers, give things of value to employee committees that consist of *256 employees of more than one employer. Appellants emphasize that section 1155.4 refers to "any agricultural employer or association of agricultural employers or any person who acts as a labor relations expert ..." while subdivision (c) refers to employees "of such employer...." Relying upon the words "of such employer," appellants believe that subdivision (c) does not apply because the Committee consisted of employees from several different employers, rather than consisting primarily of appellants' employees.
Disagreeing, the UFW states that appellants' construction of section 1155.4(c) is plainly inconsistent with the statute's purpose and would permit employers to easily evade the statutory prohibition by, for example, simply including one non-employee member on a committee. The UFW emphasizes that the statute must be construed to achieve the legislative objective and that therefore section 1155.4(c) is meant to prohibit the conduct occurring in this case.[6]

C. History of Section 11554

In addressing this issue, we first consider section 1155.4's legislative history. Section 1155.4 was enacted as part of the Alatorre-Zenovich-Dunlap-Berman Agricultural Labor Relations Act of 1975 (ALRA). (§ 1140 et seq.) In enacting that legislation, the Legislature stated that "It is hereby stated to be the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their `employment, and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Stats.1975, 3d Ex.Sess., ch. 1, § 2, pp. 4013-4014.)
The California Act was in large measure modeled upon the National Labor Relations Act (NLRA). (Vista Verde Farms v. Agricultural Labor Relations Bd. (1981) 29 Cal.3d 307, 311-312, 172 Cal.Rptr. 720, 625 P.2d 263.) Section 1155.4 is virtually identical to a provision of the federal Labor Management Relations Act, 1947, which is popularly known as the Taft-Hartley Act (hereafter Taft-Hartley). The primary difference between section 1155.4 and the provision in Taft-Hartley is that section 1155.4 adds the words "agricultural" in appropriate places to make plain that, unlike Taft-Hartley, it applies to agricultural employers and employees. (See Taft-Hartley, § 302(a), 29 U.S.C., § 186(a).) The fact that section 1155.4 was modeled upon 29 United States Code section 186 is also indicated by express statutory references to the federal act. (See e.g. §§ 1155.6; 1140.4.)
The parties agree that the Legislature adopted section 1155.4 with no particular intent other than to extend the protections of Taft-Hartley to agricultural employees in California. Both sides therefore urge us to look to the intent of Congress in enacting 29 United States Code section 186 when we construe section 1155.4.[7]
"In 1946 Congress was disturbed by the demands of certain unions that the employers contribute to "welfare funds' which were in the sole control of the union or its officers and could be used as the individual officers saw fit. The United Mine Workers' demand that mine operators create a welfare fund for the union by contributing 10 cents for each ton of coal mined, caused the Congress to act. The Case Bill, H.R. 4908, 79th Cong., 2d Sess., which regulated *257 welfare funds in a manner similar to § 302, was enacted in 1946, but was vetoed by the President. The following year the Taft-Hartley Act containing § 302 was passed over another veto." (United States v. Ryan (1956) 350 U.S. 299, 304-305, 76 S.Ct. 400,100 L.Ed. 335.)
"The Taft-Hartley Bill did not succeed in stamping out the corruption problem, however. Many of those dishonest enough to betray the employees' interests prior to the legislation were devious enough to avoid the reach of the Taft-Hartley Act. '[Widespread public concern' with `racketeering, crime and corruption' [fn. omitted] continued; and the Eighty-Sixth Congress responded by enacting the Labor Management Act of 1959. By so doing, Congress hoped to `close loopholes' which 'both employer representatives and union officials [had] turned to advantage at the expense of employees.' [Fn. omitted.] The bill was intended to make certain that employer representatives, like other trustees, would not profit from their positions of trust." (United States v. Lanni (3d Cir.1972) 466 F.2d 1102,1104.)
"The 1959 amendments: `remove any doubt that all forms of bribery which might escape the provisions of [the then] existing law would be prohibited under pain of criminal penalties.... The intent of these amendments ... is to forbid any payment or bribe by an employer [or] anyone who acts in the interest of an employer whether technically an agent or not and to forbid the receipt of any such bribe by any person, whether an individual, an officer or employee of a labor organization or a committee representing employees. Payment to and receipt of such payments by any union officer or employee having the intent of influencing such officer or employee in respect to any of his actions, decisions or duties as a representative of employees or as such union officer or employee would also be made a criminal offense.' "(United States v. Lanni supra, 466 F.2d 1102, 1105, quoting United States Code Congressional and Administrative News, 86th Cong., 1st Sess.1959 Vol. II, p. 2360.)
The legislative materials reveal that a congressional subcommittee had been investigating, among others, Nathan W. Shefferman and his firm, Labor Relations Associates of Chicago, Inc. Shefferman was paid by employers to help them defeat unionization movements. One tactic Shefferman used was to set up and fund "so-called 'spontaneous' antiunion employee committees during union organizing drives."
The UFW argues that the Committee was just like the committees that Shefferman formed. It therefore contends that appellants' conduct is exactly the type of conduct Taft-Hartley  and by extension the ALRA  was designed to prevent. Appellants argue that Shefferman's committees were all single-employer committees expressly formed at the behest of the employer, and that therefore their minimal contributions to the Committee, which they emphasize was "preexisting and grassroots," are not at all comparable to the conduct with which Congress was concerned.

D. Analysis

Having set forth the parties' contentions and the history of the statute, we must next interpret the statutory language. In so doing, we must ascertain the Legislature's intent so as to effectuate the purpose of the law. To determine the Legislature's intent, we first examine the words of the statute, making sure that we give the language its usual and ordinary meaning. We must read the statutory words in context, consider the nature and purpose of the statutory enactment, and not view sentences in isolation but analyze them in light of the statutory scheme. (Lewis v. Superior Court (1999) 19 Cal.4th 1232, 1239, 82 Cal.Rptr.2d 85, 970 P.2d 872.)
We are mindful that "[t]he object that a statute seeks to achieve is of primary *258 importance in statutory interpretation" and courts should reject a "proposed interpretation [that] would defeat the legislative objective." (Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 987, 4 Cal.Rptr.2d 837, 824 P.2d 643.) Our own court has stated that a "`statute must be read in light of both the objective it seeks to achieve and the evil it seeks to avert.'" (Henslee v. Department of Motor Vehicles (1985) 168 Cal.App.3d 445, 452, 214 Cal. Rptr. 249.)
Applying these principles, we believe that section 1155.4(c) applies to prohibit appellants' conduct. Our interpretation is consistent with the overall statutory scheme, avoids creating a loophole, furthers the legislative goals, is consistent with section 1140.4's mandate regarding liberal construction of the phrase "agricultural employer" and comports with the tendency of the federal courts to construe the comparable federal law, 29 United States Code section 186, expansively. As we explain below, appellants' construction does not achieve any of these important objectives.
First, appellants' interpretation of section 1155.4(c) makes little sense given the situations which section 1155.4(c) concededly covers. Specifically, section 1155.4 refers to an "association of agricultural employers." An association of agricultural employers, as appellants concede, is subject to section 1155.4(c). Thus, where an "association of employers" is involved, the words "such employer" would necessarily mean more than one employer.
Given this fact, we can see no real reason for not including within the ambit of the phrase "such employer," two or more employers, even though they technically have not formed an "association." Creating a distinction between an "association of employers" and two or more employers appears to have no purpose. We can think of no policy reason for excluding from section 1155.4(c)'s scope a committee consisting of employees from different employers merely because the employers have not formed an "association of employers." Employer funding of employee committees is likely to co-opt that committee's independence regardless of whether the employers constitute an association of employers.
Second, and importantly, appellants' interpretation creates a loophole that greatly undermines the strength of the statute. Appellants' construction conflicts with the legislative goal of protecting against corruption and undue influence in the collective bargaining process and, in fact, threatens to eviscerate the statute. (Stats 1975, 3d Ex.Sess., ch. 1, § 2.) In particular, under appellants' view, employers can do together what they are prohibited from doing individually. In other words, if employees of one employer form a committee, and the employer gives them something of value, then subdivision (c) prohibits that conduct. But if employees of several employers form a committee, creating a force which would likely be more powerful, and each or any of those employers give that group a thing of value, then appellants would have us hold that section 1155.4 is not violated. As the trial court stated, "[I]sn't that a great way to avoid the statute, is to simply have the employees of more than one bargaining unit band together and then effectively the provisions of ... 1155.4 are eliminated?"
Third, because section 1155.4 is modeled upon 29 United States Code section 186 and because there are no California cases construing section 1155.4, review of federal precedents is useful. (Vista Verde Farms v. Agricultural Labor Relations Bd., supra, 29 Cal.3d 307, 318, 172 Cal.Rptr. 720, 625 P.2d 263; Michael Hat Farming Co. v. Agricultural Labor Relations Bd. (1992) 4 Cal.App.4th 1037, 1044, 6 Cal.Rptr.2d 179; see also Belridge Farms v. Agricultural Labor Relations Bd, (1978) 21 Cal.3d 551, 557, 147 Cal.Rptr. 165, 580 P.2d 665.) That review discloses that federal courts have consistently construed 29 United States Code section 186 expansively, so that the legislative goals of preventing corruption *259 are promoted, rather than weakened. Thus, the federal courts have tended to interpret section 1155.4's federal counterpart in a manner that avoids creating exceptions to the statutory prohibitions.
For example, in United States v. Ryan, supra, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335, the United States Supreme Court rejected a narrow construction of the term "representative" under 29 United States Code section 186. The defendant had argued that the term "representative" had a technical meaning and only covered "the exclusive bargaining representative" of the employees. The court emphasized that the statute referred to "any representative of any employees" and therefore decided that the term "representative" included any person authorized by the employees to act for them in their dealings with employers. In rejecting a more limited construction of the word, the court emphasized that a narrow construction would "substantially defeat the congressional purpose" and make it easy for the statute to be evaded. (Id. at p. 304, 76 S.Ct. 400.)
In Sheet Metal Contractors Ass'n. v. Sheet Metal Wkrs. I. Ass'n. (N.D.Cal.1956) 145 F.Supp. 626 (rev. on other grounds, (9th Cir.1957) 248 F.2d 307), the court held that the term "employer" under 29 United States Code section 186 covered an association of employers even though the statute had not yet been amended to include an association of employers within its scope. The court emphasized "The purpose of Congress to prevent misuse of funds ... may not be so easily evaded as defendants suggest. The funds in question obviously came from the employers. The fact that the employer association signed the agreement on behalf of the employers, rather than the individual employers, does not change the realities of the situation." (Id. at p. 627.)
In Local No. 2 etc. v. Paramount Plastering, Inc. (9th Cir.1962) 310 F.2d 179, the court concluded that, under 29 United States Code section 186, a nonprofit corporation constituted a "representative" of employees of a labor organization and that payments by employers to the corporation were prohibited.
In U.S. v. McGowan (2d Cir.1995) 58 F.3d 8, the court held that payments made by an employer fell within 29 United States Code section 186 even though the payments were made for the account of a nonemployer.
In United States v. Overton (2d Cir. 1972) 470 F.2d 761, the court held that the fact that payments were made through a non-employer corporate instrumentality could not insulate the employer from liability under 29 United States Code section 186.
United States v. Lanni, supra, 466 F.2d 1102 held that a payment was prohibited by 29 United States Code section 186 even though the employee representative received the payment through a nonemployee middleman or intermediary. The court emphasized that the defendant's "end-run tactics might be suitable on a football field, but they are not persuasive in a court of law" since the court's "purpose is to interpret a statute so that it fulfills the legislature's purpose and not to construe it, as [defendant's] would have us do, to subvert the legislative intent." (Id. at p. 1108.)
Consequently, the judicial tendency has been to further the legislative objectives by interpreting the provisions in ways which strengthen the reach of the statute, and which close loopholes, rather than in ways which narrow the statute's sweep. Our construction of section 1155.4 is consistent with that tendency, while appellants' interpretation is not.
Appellants claim that their construction does not contravene any unmistakable or clearly expressed legislative intent because there is no indication either Congress or the Legislature ever considered the issue of committees of employees from multiple employers. However, the Legislature's failure to consider this exact scenario does not mean that the legislative history is of no use to us. Indeed, "legislators are often `blissfully unaware of the existence' of the issue with which the court must grapple...." (J.A. Jones Construction Co. v. Superior Court (1994) 27 Cal.App.4th 1568, 1578, 33 Cal.Rptr.2d 206.) What is useful about the legislative history is the consistent emphasis upon *260 avoiding any possible corruption and the tendency of the courts to implement that intent by interpreting 29 United States Code section 186 expansively to ensure that loopholes are closed, rather than created. Moreover, in arguing that section 1155.4 does not apply here, appellants suggest no plausible reason for the Legislature or Congress to have intended to exempt multiple employer contributions from section 1155.4's scope while at the same time to have intended to include contributions from an "association of employers" within the statutory prohibitions.
Fourth, section 1140.4, subdivision (c) states that the term "agricultural employer" "shall be liberally construed." Since the Legislature has directed us to construe liberally the phrase "agricultural employer," it follows that the term "such employer" should also be interpreted liberally, thereby supporting the view that "such employer" includes one or more agricultural employers, as well as an association of agricultural employers, rather than, as appellants would have it, either a single agricultural employer, or an association of agricultural employers.
Appellants emphasize that section 1155.4(c) uses the phrase "in excess of their normal compensation" and that this shows that the subdivision applies only when the committee is made up of employees of the same employer. We do not see the nexus, however, between the quoted language and the number of employers who contribute to a committee. To us, the language merely confirms that the committee is to be composed of agricultural employees, rather than indicating that it is to consist of employees of a single employer.
Appellant Dutra contends that the toilets it provided were not "things of value." It cites Jolog Sportswear (1960) 1960 WL 15293, 128 NLRB 886, where an employer allowed union representatives to use its cafeteria. We find Jolog plainly distinguishable, since there is a difference between allowing the temporary use of one's own space and providing the money to pay for the use of a "thing of value."
Appellants also repeatedly argue that the Committee was a "grassroots" committee, was preexisting, and that the amount the employers contributed was minimal. Even if all those claims were true, it would not necessarily mean section 1155.4(c) was inapplicable. Specifically, section 1155.4(c) contains no exceptions for committees which are "preexisting" or "grassroots." Indeed, creating any such exception could only increase the possible ways in which the statute could be evaded. Nor does section 1155.4 impose minimum monetary requirements when prohibiting the contribution of things of value.
The United States Supreme Court has stated that 29 United States Code section 186 is "malum prohibitum which outlaws all payments [other than those set forth in certain stated exceptions], between employer and representatives." (United States v. Ryan, supra, 350 U.S. at p. 305, 76 S.Ct. 400.) "The courts have given meaning to the congressional intent by requiring a strict application of the statute. These courts hold that the only diversion of funds legal under the statute are those payments [specifically excepted]." (United States v. Silva (D.Rd. Island 1980) 517 F.Supp. 727, 734.)
In United States v. Ricciardi (2d Cir. 1966) 357 F.2d 91, the court stated "It seems reasonable to impute to Congress an intent to outlaw all payments, with certain narrow statutory exceptions, from employer to union official.... `... True, it then covers gifts, however trifling and innocuous, but we can see no reason on that account to narrow its scope. The penalties prescribed make it apparent that they could not have been meant as sanctions for heinous offenses; and Congress may have wished to put a stop to the practice, even on occasions inconsiderable and harmless in themselves, rather than to make verbal distinctions that would be troublesome in application.'" (Id. at pp. 99-100; quoting United States v. Ryan (2d Cir.1956) 232 F.2d 481, 483.)
Appellants argue that there are disputed facts regarding whether they gave things of value "for the purpose of causing such ... group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and *261 bargain collectively through representatives of their own choosing." According to appellant Miller, it did not make the donations to "cause" the Committee to do anything. According to appellant Dutra, there was no evidence the toilets it provided were actually used by the demonstrators. These arguments are without merit.
The undisputed facts reveal that the UFW is the exclusive bargaining agent for thousands of employees employed by agricultural employers in California. The undisputed facts show that the Committee engaged in various activities to oppose the UFW. These activities included public marches and demonstrations. It is also undisputed that appellants gave things of value to the Committee. There is no evidence that appellants were unaware of the nature of the Committee, unaware that it opposed the UFW, or ignorant that the donations had been made.
These facts satisfy the statutory "for the purpose of requirement. Section 1155.4(c) does not, as appellants suggest, require evidence that the donations caused the recipient to engage in any particular conduct, or require evidence that the thing of value was used in a particular setting. Rather, its requirements are clear. Further, we note that conduct which has been deemed outside the scope of the statutory prohibition has been specifically excepted under 29 United States Code section 186, subdivision (c), via section 1155.6.
In sum, the undisputed facts reveal that appellants were agricultural employers, that the Committee was made up of agricultural employees, including employees of appellants, and that appellants gave things of value to the Committee to promote the Committee's agenda. For these reasons, we conclude that the undisputed facts show that appellants violated section 1155.4.

II. Constitutionality

Appellants argue that section 1155.4 unconstitutionally infringes on the free speech rights of employees and employers to make and solicit donations. We disagree.
In Labor Board v. Cabot Carbon Co. (1959) 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175, the United States Supreme Court decided that an employee committee constituted a labor organization under the NLRA. In so holding, the court rejected the respondents' First Amendment claim: "Respondents argue that to hold these employee committees to be labor organizations would prevent employers and employees from discussing matters of mutual interest concerning the employment relationship, and would thus abridge freedom of speech in violation of the First Amendment of the Constitution. But the Board's order does not impose any such bar; it merely precludes the employers from dominating, interfering with or supporting such employee committees which Congress has defined to be labor organizations." (Id. at p. 218, 79 S.Ct. 1015.)
Similarly, section 1155.4 imposes no impermissible restrictions upon appellants' speech. It merely precludes appellants from contributing things of value to the individuals or entities specified within the statute.
In NLRB v. Gissel Packing Co. (1969) 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the United States Supreme Court made it clear that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a `threat of reprisal or force or promise of benefit.'" (Id. at p. 618, 89 S.Ct. 1918.) Gissel teaches that "[expression or association that would otherwise be protected may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor-management relations in the public interest." (Intern. Union, etc. v. Nat. Right To Work (D.C.Cir.1978) 590 F.2d 1139, 1148.)
Appellants cite a number of cases, none of which are on point. More on point is Marshall v. Local Union 20, Intern. Broth. (6th Cir.1979) 611 F.2d 645. In Marshall, the Sixth Circuit found that a statute prohibiting moneys of an employer from being contributed or applied to promote the candidacy of any person in a union election was not unconstitutional, despite the claim that it violated the First *262 Amendment. The court emphasized that the incidental restriction on speech was no greater than was essential to promote the important governmental interests. (Id. at p. 652.)
Like the statute in Marshall, section 1155.4 does not violate the First Amendment. By prohibiting employers from giving "things of value," the statute imposes only an incidental restriction on speech, which is no greater than necessary to preserve the important interest of preventing corruption and coercion in the collective bargaining process. Employers and employees are otherwise free to express their views about unionization.

III. Preemption

Appellant Miller argues that the Agricultural Labor Relations Board has jurisdiction over this matter. The trial court rejected this contention. As we will explain, we agree with that conclusion.
In federal labor law, judicially-developed doctrine precludes courts from exercising jurisdiction over disputes which involve unfair labor practices; the disputes are to be heard by the National Labor Relations Board instead. (San Diego Unions v. Garmon (1959) 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775.) Even if the conduct at issue is only "arguably" prohibited by the provisions of the NLRA that define unfair labor practices, courts lack jurisdiction. (Id. at p. 246, 79 S.Ct. 773.) Federal district courts, however, do have jurisdiction to restrain violations of section 186, because subsection (e) of section 186 expressly provides for such jurisdiction. (29 U.S.C., § 186(e) (hereafter subsection (e).)
The ALRA codifies the basic concept of deferring to a board; Labor Code sections 1160-1160.8 outline procedures for the Agricultural Labor Relations Board to receive and resolve complaints of unfair labor practices, with superior court involvement only at the request of the board. Labor Code section 1160.9 then provides that those procedures are "the exclusive method of redressing unfair labor practices."
The UFW argues there is jurisdiction here because section 1155.4 describes the conduct it addresses as "unlawful" rather than as an unfair labor practice. While that is true, the same conduct arguably would be an unfair labor practice under the broad definitions of unfair labor practices in Labor Code section 1153.
The ALRA has no provision equivalent to subsection (e) that would eliminate any dispute as to whether there is jurisdiction here. In attempting to explain why it is unimportant that there is no such provision in the ALRA, the UFW asserts that at the time Taft-Hartley was enacted and when it was amended in 1959, Congress "had not yet amended" 28 United States Code section 1331 to give federal district courts jurisdiction over all claims arising under federal law. The UFW suggests that the California Legislature did not need to enact a counterpart to subsection (e), because our superior courts, unlike federal district courts, are courts of general jurisdiction.
In actuality, Congress did not even enact 28 United States Code section 1331 until a year after the Taft-Hartley Act, but from the outset section 1331 provided for district court jurisdiction over all actions arising under federal law. (See 28 U.S.C.A., § 1331, Historical and Statutory Notes, Amendments.) Furthermore, federal district courts have had such jurisdiction under predecessors to 28 United States Code section 1331 since 1875. (Zwickler v. Koota (1967) 389 U.S. 241, 246-247, 88 S.Ct. 391, 19 L.Ed.2d 444.) Thus, when Congress amended the Taft-Hartley Act to include the provisions at issue in section 186, there was no doubt that federal district courts had jurisdiction over questions arising under federal law; the UFW's explanation does not hold.
The real reason it was necessary for Congress to enact subsection (e) if it wanted federal district courts to be able to restrain violations of section 186, is that federal courts' authority to issue injunctions in the labor context is otherwise severely constrained by the Norris-La Guardia Anti-Injunction Act of 1932. (29 U.S.C, § 101 et seq.) Subsection (e) provides *263 that the Anti-Injunction Act (referred to as "chapter 6 of this title") and certain other limitations do not apply with respect to enjoining violations of section 186.
The question remains whether there is jurisdiction here, given that conduct that violates section 1155.4 arguably is an unfair labor practice as well. We conclude there is jurisdiction. Although we may look to federal precedent under the NLRA, and although Gannon counsels deference to the board where the conduct at issue "arguably" is an unfair labor practice, we do not find that dispositive. First, this case does not involve the issue of state deference to a federal regulatory scheme that formed part of the basis of the Garmon court's holding. (See 359 U.S. at p. 244, 79 S.Ct. 773.) Furthermore and more fundamentally, it would be a bizarre and unwarranted result if, in the name of conforming to federal precedent, we reached a conclusion exactly opposite of that which would occur under federal law.
We must presume that when the Legislature enacted the ALRA, it was aware that the courts, not the National Labor Relations Board, adjudicated alleged violations of section 186. Had the Legislature desired a different approach in California under the ALRA, it would have been a simple matter to indicate that the exclusive jurisdiction of the Agricultural Labor Relations Board extends over all alleged violations of the act. By describing the specific conduct prohibited by section 1155.4 as "unlawful" rather than "unfair" the Legislature demonstrated an intent that section 1155.4 be treated differently, at least for some purposes. Consequently, we conclude the trial court properly exercised jurisdiction over this action.

IV. Business and Professions Code Section 17200

According to appellants, their violations of section 1155.4 were "isolated" incidents and therefore cannot support liability under Business and Professions ' Code section 17200 because that statute requires a "pattern" of unlawful conduct. This argument is without merit.
In response to the California Supreme Court's 1988 ruling that a "business practice" under Business and Professions Code section 17200 must encompass more than a single transaction (see State of California ex rel Van De Kamp v. Texaco, Inc. (1988) 46 Cal.3d 1147, 1169-1170, 252 Cal.Rptr. 221, 762 P.2d 385), the Legislature amended the statute in 1992 to provide that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice...." The California Supreme Court has interpreted the 1992 amendment as overruling that part of Van De Kamp that interpreted the statute to require more than a single "act." (Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 570, 71 Cal.Rptr.2d 731, 950 P.2d 1086.) Accordingly, under the current version of the statute, even a single act may create liability. (Klein v. Earth Elements, Inc. (1997) 59 Cal. App.4th 965, 968, fn. 3, 69 Cal.Rptr.2d 623; Podolsky v. First Healthcare Corp. (1996) 50 Cal.App.4th 632, 653, 58 Cal.Rptr.2d 89.)
Although appellants cite Hewlett v. Squaw Valley Ski Corp. (1997) 54 Cal. App.4th 499, 63 Cal.Rptr.2d 118, it is not controlling. This is because Hewlett involved a suit filed in 1989, and the Hewlett court therefore applied the statute as it read then, rather than as amended in 1992. (Id. at pp. 514, 518, 63 Cal.Rptr.2d 118.)
For these reasons, we reject appellants' contention that section 17200 does not apply.

V. Mootness

Appellants contend that this lawsuit is moot because the Committee no longer exists. Appellant Clint Miller Farms contends that injunctive relief was improper because there was no threat of future harm because the Committee has been dissolved.
"`It is settled that the voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges *264 where by the mere violation of a party the challenged practices may be resumed.'" (Marin County Bd. of Realtors, Inc. v. Palsson (1976) 16 Cal.3d 920, 929, 130 Cal.Rptr. 1, 549 P.2d 833.) It is also well established that an appeal is not rendered moot where the parties raise substantial questions of public interest that are likely to recur. (Ibid; see also Feminist Women's Health Center v. Blythe (1995) 32 Cal.App.4th 1641, 1658-1659, 39 Cal. Rptr.2d 189.)
In this case, there was a possibility that appellants could fund another Committee. Just as the PWC-AWA dissolved, only to be replaced by the AWC, a "new" committee which appellants would then fund could easily appear in the absence of the injunctions. For these reasons, we conclude that the matter is not moot.

VI. Overbroad

Appellant Clint Miller Farms contends the injunction is overbroad.
The trial court's judgment and injunction provided:
"IT IS HEREBY DECLARED defendants Clint Miller Farms and Dutra Farms violated California Labor Code § 1155.4 by providing money or other things of value to the Ag Workers of America and Pro Workers Committee;
"2. Defendant Clint Miller Farms, and its officers, agents, assigns, successors, or persons acting in its interest or in concert ARE HEREBY ENJOINED and RESTRAINED from paying, lending or delivering any money or other thing of value to any employee or group or committee of employees, in excess of their normal compensation, or to any officer, agent servant, successor, employee, assign, or person acting in concert with or in the interest of such employee or group or committee, for the purpose of causing such employee or group or committee, directly or indirectly, to influence any employee in the exercise of the right to organize and bargain collectively through representatives; or to any representative of its employees; or any agricultural labor organization, or officer or employee thereof, that represents or seeks to represent agricultural employees."
Appellant Clint Miller complains that the injunction should have been limited to the specific wrongdoings alleged, and to the scope of section 1155.4. It contends that the injunction was improper because it prevented Clint Miller from making donations to any person acting in the interest of any employee group or committee of employees. It also argues that, as written, it could be held in contempt for making donations to a local church if the church supports the farmworkers in the exercise of their right to bargain collectively.
These arguments are without merit. Once illegal practices have been found, courts have the "`power to fashion remedies to prevent their "use or employment" in whatever context they may occur.' "(Hewlett v. Squaw Valley Ski Corp., supra, 54 Cal.App.4th at p. 540, 63 Cal.Rptr.2d 118, quoting Consumers Union v. Alta-Dena Certified Dairy (1992) 4 Cal.App.4th 963, 972, 6 Cal.Rptr.2d 193.) The trial court could therefore "fashion relief to fit the facts before it" (People v. Custom Craft Carpets, Inc. (1984) 159 Cal. App.3d 676, 684, 206 Cal.Rptr. 12) by preventing illegal contributions from being "laundered" through third parties. There was evidence to suggest that that labor consultants had guided the Committee so there was some justification for the fear that contributions would be made through a third party. Appellants' claim that the injunction would prevent them from contributing to a church is without merit. The injunction only prevents contributions made to an "an employee or group or committee of employees"not a church.
For these reasons, we reject Clint Miller's challenge to the wording of the injunction.

DISPOSITION
The judgment is affirmed.
COTTLE, P.J., and MIHARA, J., concur.
NOTES
[*] Kennard, J., dissented.
[1] All further unspecified statutory references are to the Labor Code.
[2] In so doing we take no position on the parties' minor dispute as to whether there was more than one committee; that dispute is immaterial to the issues in this appeal.
[3] The UFW had originally moved for summary adjudication but then abandoned one of its causes of action, and thereby converted the motion into one for summary judgment.
[4] In the proceedings below, the UFW contended that Dutra had also paid for the Committee's telephone bills. Because the trial court believed that issue was in dispute, it did not base its ruling upon it.
[5] Although they filed a single joint motion below, Miller and Dutra have filed separate briefs on appeal. Those briefs make largely similar arguments, as does the brief of amicus curiae, the Ventura County Agricultural Association.
[6] The UFW has never argued that the conduct here falls within any of the other subdivisions of section 1155.4, and therefore we do not address the applicability of those other subdivisions.
[7] We have previously granted appellants' unopposed motions to take judicial notice of various Congressional materials.